## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Hollis J. Larson,

      Plaintiff,

v.

Bryce Bogenholm, *et al.*,

      Defendants.

Case No. 19-cv-2811 (WMW/DTS)

**REPORT AND RECOMMENDATION**
**and**
**ORDER**

---

Hollis Larson, MSOP, 1111 Highway 73, Moose Lake, MN 55767, *Pro Se* Plaintiff

Leah Tabbert, Minnesota Attorney General's Office, 445 Minnesota Street, Suite 1100, St. Paul, MN 55101, for the State Defendants

Susan Tindal and Andrew Wolf, Iverson Reuvers Condon, 9321 Ensign Avenue South, Bloomington, MN 55438, for the Carlton County Defendants

Ryan Zipf, League of Minnesota Cities, 145 University Avenue West, St. Paul, MN 55103, for the Moose Lake Defendants

---

Plaintiff Hollis J. Larson again asserts a multitude of civil rights and other claims arising from a 2017 incident at the Minnesota Sex Offender Program ("MSOP") in Moose Lake, Minnesota, in which an MSOP employee was injured. He was prosecuted for fourth degree assault but acquitted by a jury. He brings federal civil rights claims under 42 U.S.C. § 1983 and civil rights conspiracy under 42 U.S.C. §§ 1983, 1985, and 1986, as well as state law claims against 19 state, county, and municipal defendants. Larson alleges federal claims for unlawful arrest, detention, and prosecution; First Amendment retaliation; malicious prosecution; failure to properly screen, hire, and train; and conspiracy. He alleges state law claims for malicious prosecution, false arrest and detention, intentional infliction of emotional distress, and

negligence. The State Defendants[1], Carlton County Defendants[2], and City of Moose Lake Defendants[3] move to dismiss all claims. The Court recommends their motions be granted, all federal claims be dismissed, and that the Court decline to exercise supplemental jurisdiction over the state law claims. In addition, for the reasons discussed below, the Court denies as moot Larson's motion to stay the case and recommends that his motion for temporary restraining orders and permanent injunctions be denied because it is not based on the causes of action pleaded in his complaint.

**FINDINGS OF FACT**

**I.     Larson's Prior Lawsuit**

This lawsuit is substantially similar to a previous lawsuit that was dismissed without prejudice in September 2019,[4] a month before Larson filed the present lawsuit.[5] He has now dropped two defendants[6] and added the Minnesota Department of Human Services and the MSOP program. He added some causes of action and deleted others, and added several dozen paragraphs so that this second complaint is 14 pages longer than his first one.[7] He also

---

[1] Minnesota Department of Human Services, MSOP, Nathan Madsen, Benjamin Zuk, Becky Benson, Jensina Rosen, Kyle Randa, Scott Giannini, Bryan Carman, Anthony Herring, Cathy Canilla, and Joseph Marczak.

[2] Jesse Berglund, Benjamin Ranallo, Jeffrey Boucher, and Carlton County.

[3] Bryce Bogenholm, Jason Syrett, and City of Moose Lake.

[4] *Larson v. Bogenholm*, No. 18-cv-2554, 2019 WL 5149985 (D. Minn. July 30, 2019), *report and recommendation adopted,* 2019 WL 4565559 (Sept. 20, 2019).

[5] The State Defendants argue that Larson's federal claims here are barred by res judicata. They interpret the previous dismissal order as dismissing without prejudice only the state law claims (over which the Court declined to exercise supplemental jurisdiction), because the order otherwise adopted the report and recommendation which had recommended dismissal with prejudice of the federal claims. State Defs.' Br. 6, Docket No. 39. However, the Court's previous order on its face dismisses the complaint without prejudice, and res judicata does not apply here. *See* Order, 2019 WL 4565559, at *4.

[6] Carlton County District Court Judges Macaulay and Floerke

[7] For purposes of this R&R, the "first" lawsuit or complaint refers to Case No. 18-cv-2554 and the "second" complaint refers to the present action because both lawsuits arise out of the same

2

attached 38 pages of exhibits consisting of two incident reports, an investigative report, the Carlton County assault complaint, several MSOP policies,[8] statutory provisions regarding health care, and the Joint Powers Agreement between the State and Carlton County for handling suspected criminal activity involving MSOP clients. *See* Docket No. 1-1.

The State Defendants submitted two documents in the public record from his Carlton County District Court assault prosecution, specifically, the jury verdict form and Judge Floerke's order denying his motion to dismiss the charge for lack of probable cause. *See* Tabbert Aff. Exs. A & B, Docket No. 40-1. The Moose Lake Defendants also submitted public documents from his assault case. *See* Zipf Aff. Exs. B, C & D, Docket No. 47-1.

The facts of the case are set forth below. They are substantially the same as in Larson's first complaint because it is the same incident and the same prosecution. The factual premise underlying Larson's first lawsuit was that he fell down and accidentally caused an injury to MSOP Security Counselor Nathan Madsen. Specifically, Larson pleaded that, after being locked in a cell to which he had just been transferred, he fell down, causing the chain connected to his handcuffs to be pulled through the cuff port in the door and through Madsen's hands, resulting in a cut to Madsen's little finger. First Compl. ¶ 3. But because his fall was an accident and not intentional, he argued, he did not really "cause" the injury and thus there was no probable cause to charge him with assault. In rejecting his argument, the Court noted that "the nature of Larson's fall - whether it was intentional or accidental - is immaterial to whether the

---

2017 incident that resulted in the prosecution of Larson for assault. The Court recognizes that No. 18-cv-2554 was not the first *ever* lawsuit Larson has filed. *See, e.g.,* Tabbert Aff. ¶¶ 7-8 (noting 18 other lawsuits filed by Larson in state and federal court), Docket No. 40.

[8] The four MSOP policies are entitled High Security Area; Use of Force and Restraints; Client Movement Inside the Secure Perimeter; and Searches - Clients. *See* Exs. 3-6, Docket No. 1-1 at ECF pages 5-22.

fall caused the MSOP security counselor's injury. The complaint unambiguously alleges that Larson's fall was a *cause* of the injury." Order, 2019 WL 4565559, at *2.

In response to the Court's statement that his complaint "unambiguously alleges that Larson's fall was a *cause* of the injury," Larson decided to make his second complaint more ambiguous regarding his fall. Specifically, Larson excised particular words and phrases that the Court quoted in dismissing his claims in the first lawsuit. Then he inserted the word "exculpatory" in dozens of places, in particular to describe the Incident Reports. *See* Compl. Sec. II ¶¶ 35, 40, 76-80, 82-83, 89, 94-96, 99-100, 127, 138, 146, 151, 165, 192, 194, 197, 199, 205-06. He also added in dozens of places the assertion that Madsen "caused his own injury" or "admits to causing his own injury." *Id.* ¶¶ 24, 27, 34-36, 46, 52-54, 94-96, 99-101.

Most notably, Larson's second complaint omits specific mention of accidentally *falling down*, causing the chain to cut Madsen's finger. Now he just calls it "the accident" [*id.* ¶ 4][9] and says "the waist chain was travelling into the cell" where Larson was located [*id.* ¶ 23]. *Compare* First Compl. ¶ 3:

---

[9] Larson nonetheless tries to minimize his use of the word "accident" in the second complaint, instead substituting his assertion that he did not cause Madsen's injury. *Compare* First Compl. Sec. II ¶ 23 ("At his bail hearing on May 19, 2017, plaintiff stated, on the record, *that the incident in which defendant Madsen was injured was an accident* and that plaintiff had absolutely no intent to harm, injure, or assault Madsen." (emphasis supplied)) *with* the present ¶ 61 ("At his bail hearing on May 19, 2017, plaintiff stated, on the record, *that he had not caused Madsen's injury* and that plaintiff had absolutely no intent to harm, injure, or assault Madsen." (emphasis supplied)); and *compare* First Compl. Sec. II ¶ 1 ("*Plaintiff was involved in an incident* while being moved . . . in which … Madsen *was accidentally injured*") *with* the present ¶ 1 ("while plaintiff was being moved . . . Madsen *sustained an injury*") (emphasis supplied)); and *compare* First Compl. Sec. II ¶ 39 ("[The prosecutors] refused to make further investigations . . . [despite] repeatedly hearing plaintiff state in court that *the incident was an accident*") (emphasis supplied) *with* the present ¶ 78 ("[The prosecutors] refused to make further investigations . . . [despite] repeatedly hearing plaintiff state in court that *he did not cause Madsen's injury*.") (emphasis supplied)).

> After being locked into the second cell, plaintiff fell down, which caused the chain connected to the handcuffs securing him to be pulled through defendant Madsen's hands resulting in a small cut on Madsen's little finger.

*with* this lawsuit's Compl. ¶ 3:

> After being locked into the second cell, events occurred as described below in which Madsen caused himself to be cut on the little finger of his right hand.

But Larson's factual premise that he accidentally fell down (and thus did not intend to injure Madsen) remains the same, as it must. *See* Pl. Br. 8 ("Plaintiff's allegation that he **fell down, an accident**, in which Madsen caused his own injury, must be taken as true") (emphasis supplied), Docket No. 69; Pl. Br. 16 (same), Docket No. 70. The chain was "travelling into the cell," as Larson now puts it in ¶ 23, because Larson *caused* it to travel, either by accident when he fell down (his version) or intentionally when he yanked on it (Madsen and Zuk's version).

He argued in the first lawsuit that causing the chain to move when he fell down is not an admission that he caused the resulting injury, and that "[a]n accident *IS NOT* an 'act' of plaintiff's."[10] But he cannot plead around his own factual premise that in the act of falling he accidentally caused the chain to go through Madsen's hand and cut his finger. This was and is the only plausible reading of his complaint, and it is the basis of his argument that he lacked any intent to injure Madsen, *i.e.,* commit assault. *See* Compl. Sec. II ¶ 61 (alleging he "had absolutely no intent to harm, injure, or assault Madsen"), ¶ 81 (same).[11]

Larson's assertion that Madsen "caused his own injury" is based on his theory, absent from the first complaint, that no written MSOP policy requires or allows the use of handcuffs and waist chains to move a detainee from one cell to another and, further, that no MSOP policy, written or unwritten, requires or allows a security counselor to put the waist chain on the floor

---

[10] *See* Pl. Br. 16, Docket No. 33 and Objection at 2, Docket No. 79 in Case No. 18-cv-2554.
[11] The alteration in ¶ 61 from the original complaint's ¶ 23 is discussed in footnote 9.

5

and secure it with his foot. *See, e.g.,* Compl. Sec. II, ¶¶ 13,[12] 18.[13] Thus, Larson argues, if the Security Counselors had followed policy and not used restraints, or if Madsen had secured the waist chain differently or not held it in his hand as it was "travelling into the cell" through the cuff port, his finger would not have been cut. Accordingly, Madsen "caused his own injury." *See id.* ¶¶ 23-25. Under this theory, the Incident Reports written by Madsen and Zuk are "exculpatory" because they document the use of handcuffs and a waist chain when moving Larson to the other cell. To support this theory, the second complaint cites and quotes portions of the Incident Reports but re-writes them to, for example, delete the phrase "Larson violently pulled" the restraints and replace it with "[While the waist chain was travelling into the cell]." *See id.* ¶¶ 11-12, 23.

Larson further asserts that, because the Security Counselors were not following policy in using restraints when transferring him between cells, Madsen was not performing a "duty imposed by law, policy, or rule," a required element of the assault statute under which Larson was charged. *Id.* ¶¶ 27-29 (citing Minn. Stat. § 609.2231, subd. 3a(b)(1)).[14] He contends this alleged policy violation also establishes there was no probable cause to arrest and prosecute

---

[12] Paragraph 13: "There is no written MSOP policy (*see,* Exhibits #3, 4, 5, and 6, attached and incorporated by reference herein) that requires, or *even allows,* an MSOP detainee to be handcuffed and restrained with a waist chain to be moved from cell to cell in HSA."

[13] Paragraph 18: "There is no provision in MSOP policy, written or unwritten, allowing or requiring Madsen to place the waist chain on the floor and secure it with his foot."

[14] He also claims their use of restraints violated the Patient's Bill of Rights, Minn. Stat. § 144.651. *Id.* ¶¶ 30-31 & Ex. 9. In the state criminal proceeding, Judge Floerke pointed out that Larson "is civilly committed to MSOP pursuant to Minn. Stat. § 253B.001 *et seq.*, which has its own section on the Rights of Patients, § 253B.03." Tabbert Aff. Ex. A at 8, Docket No. 40-1.

him for assault, because Defendants knew or should have known that this element of the crime was absent.[15]

## II.    Facts

Larson is a civilly committed person who resides at MSOP. Compl. Sec. II ¶ 63. On May 16, 2017, while Larson was being transferred from one cell to another, an incident occurred that resulted in an injury to Madsen, one of three MSOP Security Counselors who were moving him to the new cell. *Id.* ¶ 1-2. The other two are Zuk and Scott Giannini. *Id.* ¶ 2. As discussed above, Larson alleges that after being locked into the second cell he had an "accident" (*i.e.,* fell down), which caused the waist chain connected to his handcuffs to "travel[] into the cell" (*i.e.,* be pulled as he fell down) through the cuff port in the cell door and through Madsen's hands, resulting in a cut to Madsen's little finger when Madsen "attempt[ed] to secure the waist chain with his hand or hands while the waist chain was travelling into the cell." *Id.* ¶¶ 3, 4, 23.

Larson alleges that Madsen, Zuk, and Giannini "falsely reported the accident" as an "assault on staff." *Id.* ¶ 4. He alleges they were "unable to *actually and accurately* describe what occurred in the cell in which [Larson] was detained" because surveillance video[16] shows "they were not looking into the small window in the door of the cell" to see what was happening inside. *Id.* ¶¶ 9-10, 94, 99.

Madsen wrote an Incident Report, which he signed on May 17, 2017, that states, in part:

---

[15] Although Larson did not allege a violation of MSOP policy on use of restraints in his first complaint, he did make this argument to the state court in his motion to dismiss the assault charge. Judge Floerke noted that "MSOP has a clearly articulated policy on the use of restraints" and stated that "[w]hether the alleged victim was acting in accordance with the policy is not properly before the Court at this time" and "the Court will not make a finding that, as a matter of law, the alleged victim was *not* engaged in performance of a duty imposed by law, policy, or rule at the time of his injury." Tabbert Aff. Ex. A at 8-9, Docket No. 40-1.

[16] The video is not in the record before the Court.

I applied wrist restraints to client Larson. The wrist restraints were gapped and double locked. SC Zuk and I then escorted client Larson out of RM-N102 and into RM-N113. During this process client **Larson was calm and displayed compliance. Client Larson placed his hands through the book pass of RM-N113 indicating he was going to allow SC Zuk and I to secure[] his arms and remove the wrist restraints.** RM-N113 was secured. I placed the waist chain on the floor and secured it with my foot. **Seconds later, client Larson violently pulled the wrist restraints away from SC Zuk and I before we were able to secure his arms. The wrist restraints were connected to the waist chain. I attempted to secure the waist chain with my right hand. At this time I noticed the clip on the waist chain had cut my pinky finger on my right hand. I also noticed blood coming from my right pinky area. Client Larson continued to forcefully pull away from me** while shouting something to the effect of, "Oh you fuckers see how easy it would be for me now?" I gave client Larson numerous directives to return to the book pass. **Client Larson failed to comply and continued to attempt to pull the waist chain out of my hand. I let go of the chain and client Larson pulled it through the book pass.**

SC Zuk and I continued to give client Larson directives to place his hands on the book pass. Client Larson complied seconds later. SC Zuk and SC Giannini secured client Larson's left and right arm. At this time, client Larson shouted something to the effect of, "Oh you fuckers want to get tough? Watch I'll do it again." Client Larson began to resist and pull away from staff again in a violent manner, but eventually complied with allowing us to re-secure his arms in the RM-N113 book pass. I removed the wrist restraints from client Larson.

Compl. Ex. 1, Docket No. 1-1.

Zuk wrote an Incident Report, which he signed on May 16, 2017, that states, in part:

Client Hollis [Larson] complied with being placed into wrist restraints that were gap checked and double locked before being escorted to room N113. The door to room N113 was secured and **client Hollis placed his wrist into the book pass to allow A-team to remove the restraints. SC Madsen placed the waist restraint onto the floor at that time to secure it with his foot. Before client Larson's arms were secured, he violently pulled his wrists through the book pass which were still secured in the wrist restraints that were connected to the waist restraint. SC Madsen secured the waist restraint with his hands, when the chain had cut SC Madsen's finger, SC Madsen let go of the restraints and client Larson pulled the wrist restraints and waist restraint into the room with him**. . . . Client Larson then fed the waist chain through the book pass that I had braced open only enough to retrieve the waist restraint. Client Larson then [] again placed his wrists into the book pass so that the restraints could be removed. At that time I secured client Larson's right arm and SCL Giannini was about to secure client Larson's left arm when client Larson again attempted to gain control of the restraints by pulling them into the room.

Client had said, "oh, you fuckers wanna get tuff? Fuck you guys I'll do it again!" Client Larson was pulling on the restraints at that time as I had secured the waist chain using the corner of the book pass and my foot securing the chain to the floor. Client Larson was unable to gain control of the restraints and placed his wrists back into the book pass. I again secured client Hollis's left arm and SCL Giannini secured his right arm as SC Madsen removed the wrist restraints from client Larson.

*Id.* Ex. 2.

Larson alleges that the two Incident Reports are "exculpatory." *See Id.* Sec. II ¶¶ 35, 40, 76-80, 82-83, 89, 94-96, 99-100, 127, 138, 146, 151, 165, 192, 194, 197, 199, 205-06. He alleges that, in the Incident Reports, Madsen "admits" he caused his own injury and Zuk "stipulates" that Madsen caused his own injury. *Id.* ¶¶ 23-25.

Becky Benson, MSOP OSI Investigator, conducted an investigation and prepared an Investigation Report for Bryce Bogenholm, the Chief of Police in Moose Lake. *Id.* ¶¶ 20-22, 36 & Exs. 7A & 7B.[17] She conducted digitally recorded interviews of Madsen, Zuk, and Giannini. *Id.* Ex. 7B. They reviewed their reports and confirmed to Benson that they were true and accurate. *Id.* ¶ 36 & Ex. 7B. Bogenholm initiated a criminal complaint in Carlton County District Court charging Larson with assault on Madsen pursuant to Minn. Stat. § 609.2231, subd. 3a(b)(1) (fourth degree assault on secure treatment facility personnel inflicting demonstrable bodily harm). *Id.* ¶ 38 & Ex. 8 (criminal complaint). Jesse Berglund, an Assistant Carlton County Attorney, approved the complaint, which was signed by both Bogenholm (May 19, 2017) and Berglund (May 18, 2017). *Id.* ¶¶ 47-49 & Ex. 8. Carlton County District Court Judge Robert Macaulay found probable cause for the assault charge and issued a detention order on May 19, 2017. *Id.* ¶ 60 & Ex. 8.

---

[17] There are two exhibit numbers but only one report. Ex. 7A is the cover page and Ex. 7B contains the contents of the report.

At a bail hearing on May 19, 2017, Larson sought to be released on his own recognizance, meaning back to MSOP, on the grounds that he already resided in a secure facility and his appearance for court proceedings was assured, but his request was denied. *Id.* ¶¶ 63, 66. Jensina Rosen, a State Program Administrative Supervisor, allegedly told Berglund, via email or telephone call, that Larson was too dangerous to return to MSOP. *Id.* ¶ 64. Larson posted bond on September 20, 2017, then a couple of hours later Carlton County District Court Judge Shaun Floerke released him on his own recognizance and returned his bail money. *Id.* ¶¶ 67-68, 70. On March 23, 2018 Judge Floerke revoked Larson's recognizance release and ordered that he be held in the Carlton County jail for the duration of his trial on the assault charge. *Id.* ¶ 71. Standard practice for MSOP residents out on bail during trial in Carlton County is to transport them back and forth from Moose Lake each day of the trial. *Id.* ¶ 72. Larson believes that at some point his stand-by counsel convinced the Carlton County Court to rescind the order to detain Larson at the Carlton County Jail during trial. *Id.* ¶ 74.

Larson alleges that Chief Bogenholm, Officer Jason Syrett, and prosecutors Berglund, Benjamin Ranallo, and Jeffrey Boucher had the Investigation Report, the Incident Reports, and the video; should have done further investigation; "ignored the clearly exculpatory Incident Reports of Madsen and Zuk"; and knew or should have known there was "insufficient evidence and lack of probable cause" to proceed with an assault charge against him. *Id.* ¶ 39-40, 51, 76-79, 82. He alleges Defendants maintained the prosecution against him "in retaliation for plaintiff filing a lawsuit regarding the blatantly unconstitutional conditions of the Carlton County Jail."

*Id.* ¶ 73.[18] That lawsuit was filed on July 24, 2017,[19] two months after the criminal assault complaint.

On July 18, 2017 Larson filed a motion to dismiss the criminal complaint, arguing lack of probable cause because he "fell by accident and therefore had no intent to injure" Madsen. *See* Carlton Cty. Dist. Ct. Order & Mem. (Sept. 21, 2017) at 6-9, Tabbert Aff. Ex. A, Docket No. 40-1; *see also* Compl. Sec. II ¶¶ 81-82. Judge Macaulay recused himself from the criminal case on July 25, 2017.[20] On September 11, 2017 Judge Floerke held a hearing on Larson's motion to dismiss for lack of probable cause. Order & Mem. at 1, Tabbert Aff. Ex. A, Docket No. 40-1. Larson appeared *pro se* at the hearing along with his advisory counsel. *Id.* On September 21, 2017 Judge Floerke denied Larson's motion to dismiss, finding probable cause to proceed to trial. *Id.* at 1, 6-9. His order stated, in part:

> **Defendant argues that the Court must dismiss the charge as he did not have the requisite intent to assault** the alleged victim, there was no probable cause to support the charge . . . .
>
> The issue of intent is firmly within the prov[ince] of the fact-finder. In this case, **the jury, in deciding the factual issues, will determine whether Defendant intended to assault the alleged victim by yanking the chain attached to his restraints, or if Defendant fell by accident and therefore had no intent to injure the MSOP employee.** The Court will not step into the shoes of the jury and make findings pertaining to intent, as this is a question of fact. [Citation omitted.] This is an issue to be resolved at trial and does not constitute a basis to dismiss the Complaint.
>
> Moreover, **there is adequate probable cause to preclude dismissal** of the Complaint. **The Court must determine whether there is a sufficient showing of probable cause to believe that the Defendant committed the charged offense based upon the entire record.** [Citation omitted.] **Probable cause may**

---

[18] In his first complaint, Larson identified the lawsuit as *Larson v. Lake*, District of Minnesota Case No. 17-cv-3551. First Compl. ¶¶ 41, 45.

[19] The Court takes judicial notice of the public docket and court filings in that lawsuit. *See* Fed. R. Evid. 201(b) (judicial notice); *Zimmerman v. Bellows*, 988 F. Supp. 2d 1026, 1029 n.1 (D. Minn. 2013) (judicial notice of court docket).

[20] Case No. 18-cv-2554, Docket No. 24-1 at 14 (recusal order).

**be shown by less evidence than that required for a conviction.** [Citation omitted.]

*Id.* at 7-8 (emphasis supplied).

Larson alleges "[i]t is plaintiff's belief that there is some type of 'agreement' between Berglund, Ranallo, Boucher, and possibly other Carlton County actors and Benson, Rosen, and other MSOP employees in which they 'railroad' MSOP clients into criminal charges and 'rubber-stamp' all evidentiary and procedural matters to ensure that MSOP clients are criminally charged and then coerced into pleading guilty rather than risking a conviction and return to prison, where life is *very* difficult for them." Compl. Sec. II ¶ 84. He alleges "Berglund, Ranallo, Boucher, and possibly Benson, Rosen, etc., met with each other and/or discussed plaintiff's criminal case." *Id.* ¶ 85. He further alleges that "Berglund, Ranallo, and Boucher all met with Madsen, Zuk, Benson, Randa, Giannini, Carman, Herring, Canilla, and Marczak" and "discussed the case against plaintiff" and "decided that . . . they would continue to claim that plaintiff caused Madsen's injury." *Id.* ¶¶ 88-89.

A jury acquitted Larson of assault on March 28, 2018. *Id.* ¶ 86; Tabbert Aff. Ex. B (verdict form), Docket No. 40-1. He alleges Madsen, Zuk, Benson, Randa, Giannini, Carman, Herring, Canilla, and Marczak provided false testimony. Compl. Sec. II ¶ 89-90. He contends these nine Defendants "were either 'coached,' or even coerced, to make that false testimony by Berglund, Ranallo, and Boucher and/or met among themselves prior to trial and agreed to testify in that manner." *Id.* ¶ 91.

## III.    Larson's Claims

Larson's complaint asserts 18 claims against 19 Defendants and states that all Defendants are sued in their individual and official capacities. Compl. Sec. I (Parties) ¶¶ 1-19. Counts I through XIV are Larson's federal claims (unlawful arrest, detention, and prosecution;

First Amendment retaliation; malicious prosecution; failure to properly screen, hire, and train; conspiracy). Counts XV through XVIII (malicious prosecution, false arrest and detention, intentional infliction of emotional distress, negligence) are state law claims.

Larson requests injunctive relief ordering all Defendants to refrain from similar unlawful conduct in the future against him and others similarly situated. *Id.* Sec. III (Injunctive Relief) ¶¶ 223-24. He seeks a declaratory judgment delineating the wrongs he believes he suffered and setting a permanent record of his account of the facts. *Id.* Sec. IV (Relief) ¶¶ A.1-4. He also seeks compensatory and punitive damages from each Defendant in his or her individual capacity. *Id.* ¶¶ B & C.

## CONCLUSIONS OF LAW

### I.    Standard of Review

The  three groups of Defendants move to dismiss Larson's claims for failure to state a claim under Rule 12(b)(6). Docket Nos. 36, 44, 50. To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead sufficient facts, accepted as true, to state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 570 (2007). A complaint must provide more than "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). Although a *pro se* complaint is liberally construed, it must still contain specific facts sufficient to support its legal conclusions. *Kaylor v. Fields*, 661 F.2d 1177, 1183 (8th Cir. 1981). Thus, while a court accords deference to *pro se* pleadings, it will not supply facts that are not alleged that might support the plaintiff's claim. *Stone v. Harry*, 364 F.3d 912, 915 (8th Cir. 2004). In determining whether a plaintiff has stated a plausible claim, the Court considers only the materials that are necessarily embraced by the pleadings and

exhibits attached to the complaint. *Cox v. Mortgage Elect. Registration Sys., Inc.*, 685 F.3d 663, 668 (8th Cir. 2012); *see also Kushner v. Beverly Enterprises, Inc.*, 317 F.3d 820, 831 (8th Cir. 2003) (court may consider the complaint and documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading).

Larson contends that Defendants' Rule 12 motions cannot be granted because the Court already determined that his complaint states cognizable claims when it allowed his lawsuit to proceed at the outset of the case. Pl. Br. 1, Docket Nos. 68, 69, 70. Larson is incorrect, as the Court stated in rejecting this argument in his first lawsuit. Allowing his case to go forward at the initial stage (after granting his *in forma pauperis* (IFP) application) has no bearing whatsoever on Defendants' ability to bring motions to dismiss his complaint under Rule 12. *See Larson,* No. 18-cv-2554, 2019 WL 5149985 (R&R), at *5; *see also Larson v. Jesson,* No. 11-cv-2247, 2018 WL 3352926, at *2 (D. Minn. July 9, 3018) (rejecting same argument by Larson).

## II.    Testimonial Immunity

Federal law provides individuals who testify at trial with absolute immunity from any claim based on their testimony. *Rehberg v. Paulk,* 566 U.S. 356, 367 (2012). This immunity extends to claims that witnesses conspired to present such testimony. *Snelling v. Westhoff*, 972 F.2d 199, 200 (8th Cir. 1992) (per curiam) (affirming dismissal of conspiracy claims on the ground of absolute witness immunity). Thus, the Court recommends that Larson's conspiracy claims under §§ 1983, 1985, and 1986 (Counts XII, XIII, XIV) -- which he alleges against all 19 Defendants -- be dismissed with prejudice to the extent they are based on Defendants' trial testimony. *See* Compl. Sec. II ¶¶ 88-92, 191-203.

### III.    State Defendants in their Official Capacities

The Eleventh Amendment provides a state with immunity from suit in federal court by citizens of other states and by its own citizens. *Skelton v. Henry*, 390 F.3d 614, 617 (8th Cir. 2004). When a state official is sued in his or her official capacity, the claim is treated as a claim against the state entity. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). A state agency or official may invoke the State's Eleventh Amendment immunity if it will "protect the state treasury from liability that would have had essentially the same practical consequences as a judgment against the State itself.'" *Hadley v. North Ark. Cmty. Tech. Coll.*, 76 F.3d 1437, 1438 (8th Cir. 1996) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 123 n.34 (1984)). Minnesota has not waived its immunity from suit in federal court for § 1983 damages claims, and Congress did not abrogate that immunity by enacting § 1983. *See Quern v. Jordan*, 440 U.S. 332, 345 (1979).

However, an official is not immune from an official-capacity lawsuit that seeks prospective injunctive relief. *Graham,* 473 U.S. at 167 n.14. Relief is "prospective" if it alleges an ongoing violation of federal law. *Verizon Md., Inc. v. Public Service Comm'n of Md.,* 535 U.S. 635, 645 (2002). The Court finds that Larson has not pleaded a cognizable official-capacity claim for prospective injunctive relief. His claims involve a particular incident, prosecution, and trial that occurred in 2017 and 2018, and injunctive relief would not remedy the violations he alleged regarding those events. Moreover, the only references in his complaint to arguably ongoing violations by State Defendants are not factual allegations but mere conclusory assertions and speculation. *See* Compl. Sec. II ¶¶ 84, 223-24.

Because the Minnesota Department of Human Services and MSOP[21] are immune from suit under the Eleventh Amendment, the court lacks subject matter jurisdiction and all claims against them must be dismissed without prejudice. In addition, Larson has failed to state any claim for prospective injunctive relief against the individual defendants in their official capacities, and therefore the Court recommends that all of Larson's official-capacity claims be dismissed.

## IV.    False Arrest and Unlawful Detention Claims Against Investigator Benson, Police Chief Bogenholm, and Officer Syrett

Larson asserts § 1983 claims for false arrest and unlawful detention against MSOP Investigator Benson, Moose Lake Police Chief Bogenholm, and Officer Jason Syrett (Counts I, IV, VII, VIII).

Qualified immunity protects government officials from liability for civil damages under § 1983 "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Small v. McCrystal,* 708 F.3d 997, 1003 (8th Cir. 2013) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Police officers are entitled to qualified immunity if they arrest a suspect under the mistaken belief that they have probable cause to do so, provided the mistake is objectively reasonable. *Id.* at 1006. The inquiry therefore is whether the officers had "arguable probable cause." *Amrine v. Brooks*, 522 F.3d 823, 832 (8th Cir. 2008). Probable cause exists if the totality of facts based on reasonably trustworthy information would justify a prudent person in believing the individual arrested had committed an offense. *Small,* 708 F.3d at 1006. Exculpatory evidence is relevant to whether an officer has probable cause. *Amrine.* 522 F.3d at 832. Officers are not required to conduct a

---

[21] MSOP is a program, not an agency or entity.

"mini-trial" before arrest, but probable cause does not exist when a "minimal further investigation" would have exonerated the suspect. *Id.*

### A.    Benson

Larson alleges that MSOP Investigator Benson violated his Fourth Amendment right against arrest and detention without probable cause by submitting her Investigation Report to Chief Bogenholm. The Court again finds Benson is protected by qualified immunity against Larson's claims.

In his first complaint, Larson alleged Benson received reports of the incident from the Security Counselors; investigated the incident; talked to the witnesses; watched the video; prepared the Investigation Report; and submitted it to Bogenholm. First Compl. Sec. II ¶¶ 11-13. Based on the report, Bogenholm filed the criminal assault complaint. *Id.* ¶ 15. Larson alleged that, having viewed the video, Benson must have known there was no probable cause to believe he assaulted Madsen. *Id.* ¶ 14. He repeats these assertions in the second complaint. *See* Compl. Sec. II ¶¶ 20-22, 26, 38.

However, Benson is an MSOP employee, not a Moose Lake police officer or Carlton County prosecutor. Her role was to investigate and prepare a report for Bogenholm. At the end of her report she summarized her investigation and stated "[t]he Minnesota Sex Offender Program is asking that this case be reviewed for possible criminal charges." Compl. Ex. 7B. She did not sign the criminal complaint. She did not arrest, detain, or charge Larson with assault.

Moreover, Larson has not pleaded any facts that demonstrate Benson knew or reasonably should have known that any information provided to her during the investigation was false. The video and Incident Reports are not "exculpatory," as Larson contends. First, as

the Court stated in the first lawsuit, Larson's allegations establish only that the video is "not necessarily *inculpatory*." *See* Order, 2019 WL 4565559, at *2. His second complaint deletes some of his allegations about the video. He now alleges only that it shows the Security Counselors "were not looking into the small window in the door of the cell in which plaintiff was detained." Compl. Sec. II ¶¶ 9-10.[22] Consequently, he alleges, they were "unable to *actually and accurately* describe what occurred in the cell in which [Larson] was detained." *Id.* ¶ 10. But Madsen and Zuk's Incident Reports do not claim their descriptions are based on observations from looking into the cell door window to see the inside the cell. Rather, they describe what they did, heard, saw, and felt on their side of the cell door, and their inferences from those observations. This includes the statements and threats Larson shouted, the waist chain pulling through Madsen's hand and through the book pass/cuff port very quickly and disappearing into the cell, the cut and blood on Madsen's finger, and Larson passing the waist chain back to them through the cuff port and putting his wrists into the cuff port so the restraints could be removed. *See* Compl. Exs. 1, 2. Larson's allegations about the video do not establish that the information reported by the Security Counselors was untrustworthy or that Benson acted unreasonably in relying on it.

Second, Larson's allegations do not establish that the Incident Reports are exculpatory. He contends the reports document that the Security Counselors violated MSOP policy on the use of restraints. MSOP's "Use of Force and Restraints" policy authorizes the use of restraints when "necessary for the safety of clients or others." Compl. Ex. 4 at 3. The Investigation Report

---

[22] In his first complaint Larson also alleged the video was exculpatory because the "[v]ideo recordings of the incident show only the hallway . . . and do not show what was happening inside the cell in which [Larson] was detained" and thus "there was no footage of [Larson] committing assault." *See* Order, 2019 WL 4565559, at *2 n.3.

says Larson was agitated, yelled, punched and kicked a door, and threatened MSOP staff during the hour before the Security Counselors used restraints to move him to a new cell. *Id.* Ex. 7B. It would be reasonable for Benson to believe the use of restraints in this circumstance complied with policy. In addition, Larson has not alleged any facts to show Benson knew about the alleged "*unwritten* policy . . . that the waist chain must be secured around the detainee's waist." *Id.* Sec. II ¶ 15 (emphasis supplied). Moreover, the information provided to Benson made it reasonable to believe Madsen was performing a "duty imposed by law, policy, or rule" when he was injured, as required by the assault statute under which Larson was charged. Even if this particular use of restraints violated MSOP policy in some way, it does not establish a lack of probable cause to believe Larson committed assault. Larson has failed to allege specific facts to show that any conduct violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818.

Next, the second complaint alleges two "lies" in Benson's report. First, "Benson reiterates the lie that plaintiff yanked his transfer chain from the hands of Madsen and thus committed assault against Madsen." Compl. Sec. ¶ 32. Second, "Benson also lies in her Investigation Report to Bogenholm by stating '. . . when the door was ***being closed***, client Larson aggressively yanked on his wrist restraints and pulled the waist chain through SC Madsen's hands'." *Id.* ¶ 33. He alleges "Benson's statements in ¶¶ 32 and 33 . . . are deliberate misrepresentations of the facts." *Id.* ¶ 34.

As to the first purported lie that Larson yanked on the chain, the complaint admits that Benson simply "reiterated" information from the Incident Reports. There was no basis for Benson to believe the information was not trustworthy.

The second alleged lie regarding the position of the door during the incident appears to be at most a misstatement in the report that is not material to the lawsuit. *See Riddle v. Riepe,* 866 F.3d 943, 948 (8th Cir. 2017) ("Reading the report in the light most favorable to [plaintiff], any misleading impression that the report may leave as to the order of events demonstrates at most negligence on the part of [the officer], which is insufficient to sustain a fabrication of evidence claim."). Both Incident Reports say the door "'was secured' (i.e., fully closed)." *Id.* ¶ 8 & Exs. 1, 2. Benson's Investigation Report says it was "being closed." *Id.* Ex. 7B. But there is no suggestion anywhere in the complaint and no argument in the briefs that the position of the door makes any difference to Larson's central premise that he pulled the chain accidentally as he fell, not intentionally to injure Madsen. Furthermore, Larson admits that Bogenholm did not include this incorrect information in the statement of probable cause in the criminal complaint, which "correctly states the plaintiff was 'secure inside' the cell." *Id.* ¶ 43 & Ex. 8. Thus, even if Benson's statement about the door is false, it did not impact the probable cause determination that led to his arrest and detention on the assault charge.

Larson's complaint pleads no plausible claim that Benson violated a clearly established constitutional right. Accordingly, she is protected by qualified immunity from Larson's § 1983 claims for false arrest and unlawful detention, and the Court recommends that Counts I and IV be dismissed with prejudice.

### B.    Bogenholm and Syrett

Larson alleges that Chief Bogenholm and Officer Syrett arrested and detained him without probable cause in violation of the Fourth Amendment. The Court again finds they are protected by qualified immunity against Larson's claims.

20

As discussed above, Benson prepared an Investigation Report for Bogenholm, who then submitted a criminal assault complaint to the Carlton County District Court. *Id.* Ex. 8. Judge Macaulay found probable cause and signed an order of detention [*id.*], and Syrett arrested Larson [*id.* Sec. II ¶ 151]. On its face the Investigation Report provided reasonably trustworthy information on which Bogenholm could justifiably rely in preparing the criminal complaint, and Syrett's arrest of Larson was based on the court's order. The video and the use of restraints described in the Incident Reports are not exculpatory evidence demonstrating the absence of probable cause for the assault charge.

Even accepting as true Larson's allegations that the Security Counselors and/or Benson falsified information in their reports, he has not pleaded any specific facts that Bogenholm or Syrett had reason to know the information was false. It was objectively reasonable for Bogenholm to rely on the information in Benson's report in submitting the criminal complaint and for Syrett to arrest Larson. Therefore, they are protected by qualified immunity from Larson's § 1983 claims for false arrest and unlawful detention, and the Court recommends that Counts I, IV, VII, and VIII against them be dismissed with prejudice.

## V.    Claims Against Bogenholm for Failure to Properly Screen, Hire, and Train

Larson brings § 1983 claims alleging that Bogenholm, along with the City of Moose Lake, failed to properly screen and hire Syrett [Compl. Sec. II ¶¶ 172-73] and train employees [*id.* ¶¶ 185-86] (Counts X, XI). These are the same claims he asserted against Bogenholm in the first complaint,[23] and they fail for the same reasons. In addition, as discussed below, Larson's claims against the City of Moose Lake fail to state a *Monell* claim because they offer only conclusory assertions that a city policy or custom existed.

---

[23] *See* First Compl. ¶¶ 112-17, 125-30.

Larson's second complaint identifies Bogenholm as the Chief of Police and asserts he is a policymaker [Compl. Sec. I ¶ 3, Sec. II ¶¶ 95, 97] but does not identify any city policy or allege that Bogenholm personally took any particular action regarding the screening, hiring, or training of Officer Syrett or the training of other employees. *See Iqbal,* 556 U.S. at 676 (because vicarious liability does not apply to § 1983 lawsuits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution). Larson again offers only conclusory allegations that Bogenholm, along with the City of Moose Lake, failed to adequately screen, hire, and train, which is insufficient to state a claim. Accordingly, the Court recommends dismissal with prejudice of Counts X and XI against Bogenholm.

## VI.    Prosecutorial Immunity

Larson asserts § 1983 claims against Carlton County prosecutors Berglund, Ranallo, and Boucher alleging retaliation (Count VI), false imprisonment (Count VIII), malicious prosecution (Count IX), and conspiracy (Count XII); and §§ 1985 and 1986 claims alleging they and the 16 other Defendants engaged in a conspiracy to deprive him of equal protection of the law (Counts XIII, XIV). He also alleges state law claims in Counts XV to XVIII.

Prosecutors are absolutely immune from liability under § 1983 for their conduct in initiating a prosecution and presenting the State's case insofar as that conduct is intimately associated with the judicial phase of the criminal process. *Burns v. Reed*, 500 U.S. 478, 486 (1991); *Imbler v. Pachtman*, 424 U.S. 409, 430-31 (1976). This immunity extends to actions preliminary to the initiation of a prosecution and actions apart from the courtroom, but not to administrative duties and those investigatory functions that do not relate to the initiation of a prosecution or judicial proceedings. *Woodworth v. Hulshof,* 891 F.3d 1083, 1089 (8th Cir. 2018)

(citing *Buckley v. Fitzsimmons,* 509 U.S. 259, 273-74 (1993)). A prosecutor is immune from suit even if he or she knowingly presented false, misleading, or perjured testimony or withheld or suppressed exculpatory evidence. *Id.* Prosecutorial immunity extends to claims of civil conspiracy when the prosecutor's alleged participation in the conspiracy consists of otherwise immune acts. *Id.*

Berglund, Ranallo, and Boucher are entitled to absolute prosecutorial immunity because Larson's factual allegations against them fall within the scope of their prosecutorial duties and are "intimately associated with the judicial phase of the criminal process": signing the criminal complaint, discussing the case, watching the video, continuing the prosecution rather than dropping the charge, and presenting testimony at trial [Compl. Sec. II ¶¶ 47, 49-54, 56-58, 60, 76-79, 82-85, 88-89, 91]. The second complaint, like the first, itself acknowledges that they were acting in a prosecutorial capacity: "Berglund, Ranallo, Boucher, . . . in the course of their respective duties relating to the prosecution of plaintiff, either singly or in groups, took whatever measures were necessary to bring plaintiff to trial and/or to coerce him to plead guilty . . . " [*id.* ¶ 199]. Thus, the Court recommends dismissal with prejudice of all federal claims against them (Counts VI, VIII, IX, XII, XIII, XIV) based on absolute prosecutorial immunity.

**VII.    Municipal Liability Claims Against the City of Moose Lake and Carlton County**

Larson asserts § 1983 claims against the City of Moose Lake alleging municipal liability for false arrest and unlawful detention (Counts I, II, VIII), malicious prosecution (Count IX), failure to properly screen, hire, and train (Counts X, XI), and conspiracy (Count XII); and §§ 1985 and 1986 claims alleging the city and the 18 other Defendants engaged in a conspiracy to deprive him of equal protection of the laws (Counts XIII, XIV). He also alleges state law claims in Counts XV to XVIII.

His § 1983 claims against Carlton County are for false arrest and unlawful detention (Counts I, II, IV, VIII), retaliation (Count VI), malicious prosecution (Count IX), failure to properly screen, hire, and train (Counts X, XI), and conspiracy (Count XII). He asserts §§ 1985 and 1986 claims alleging Carlton County and the 18 other Defendants engaged in a conspiracy to deprive him of equal protection of the law (Counts XIII, XIV. He also alleges state law claims in Counts XV to XVIII.

A municipality may be held liable under § 1983 for a constitutional violation that resulted from (1) an official municipal policy, (2) an unofficial custom, or (3) a deliberately indifferent failure to train. *Atkinson v. City of Mountain View*, 709 F.3d 1201, 1214 (8th Cir. 2013) (citing *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 690-91 (1978) and *City of Canton v. Harris,* 489 U.S. 378, 388 (1989)). The plaintiff must establish causation, i.e., that the policy, custom, or failure to train was the "moving force" behind the constitutional violation. *City of Canton*, 489 U.S. at 389-91; *Monell*, 436 U.S. at 691. A municipality cannot be held liable on a *respondeat superior* theory for the actions of an individual employee. *Monell*, 436 U.S. at 691.

While a plaintiff need not "specifically plead the existence of an unconstitutional policy or custom to survive a motion to dismiss," *Crumley–Patterson v. Trinity Lutheran Hosp.*, 388 F.3d 588, 591 (8th Cir. 2004), he must allege facts that would support an inference that the conduct complained of resulted from an unconstitutional policy or custom. *Doe ex rel. Doe v. Sch. Dist. of Norfolk*, 340 F.3d 605, 614 (8th Cir. 2003). Generally, an isolated incident of misconduct cannot as a matter of law establish a municipal policy or custom creating liability under § 1983. *Ulrich v. Pope Cty.*, 715 F.3d 1054, 1061 (8th Cir. 2013).

A failure to train may lead to liability if it amounts to deliberate indifference to the rights of others. "Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *City of Canton,* 489 U.S. at 389. Allegations that the training of a particular official was unsatisfactory, that a training program was occasionally negligently administered, or that an injury could have been avoided by better or more training are an insufficient basis for liability. *Id.* at 390-91. But a municipality may be liable if it had notice of prior misbehavior by its employees and failed to take remedial steps amounting to deliberate indifference to the offensive acts. *Patzner v. Burkett*, 779 F.2d 1363, 1367 (8th Cir. 1985).

Larson's complaint fails to state a claim against the City of Moose Lake. It merely states the elements of a cause of action [Compl. Sec. II ¶ 116] and makes conclusory statements that the actions of various Defendants constitute or reflect "customs, practices, and policies" of the City of Moose Lake [*id.* ¶¶ 94-95, 97, 111, 115, 173, 185]. Larson has not identified any city policy or custom, nor has he alleged any facts that would support an inference that a policy or custom existed that was the moving force behind his arrest and prosecution. He has not pleaded any facts that the City of Moose Lake had notice of any pattern of its employees committing unconstitutional acts, or had any reason to believe any training was inadequate or evidenced "deliberate indifference" to the rights of others such that it would likely lead to constitutional violations. Accordingly, the Court recommends that Larson's federal claims against the City of Moose Lake (Counts I, II, VIII, IX, X, XI, XII, XIII, XIV) be dismissed with prejudice.

Similarly, Larson fails to state a cognizable claim against Carlton County. He has not identified any county policy or custom, or alleged any facts that would support an inference that a policy or custom existed that was the moving force behind his prosecution for assault in Carlton County District Court. He merely recites the elements of a cause of action [*id.* ¶ 116] and makes only conclusory assertions that a "policy, custom, and practice" existed in Carlton County [*id.* ¶¶ 94-95, 111, 115, 131, 173, 179, 185]. Larson has not pleaded any facts to indicate that Carlton County had any reason to believe any training was inadequate and would likely lead to constitutional violations.

Larson offers only speculation that there may be a pattern of conduct by Carlton County employees and others to "railroad" MSOP clients into criminal charges: "It is plaintiff's belief that there is some type of 'agreement' between Berglund, Ranallo, Boucher, and possibly other Carlton County actors and Benson, Rosen, and other MSOP employees in which they 'railroad' MSOP clients into criminal charges and 'rubber-stamp' all evidentiary and procedural matters to ensure that MSOP clients are criminally charged and then coerced into pleading guilty rather than risking a conviction and return to prison, where life is *very* difficult for them." *Id.* ¶ 84. But his assertions are generalities unsupported by specific factual details to show any custom existed. His conjecture falls short of stating a plausible claim that Carlton County had notice that its employees were committing any unconstitutional acts or that any custom was the motive force behind the assault prosecution. Accordingly, the Court recommends that Larson's federal claims against Carlton County (Counts I, II, IV, VI, VIII, IX, X, XI, XII, XIII, XIV) be dismissed with prejudice.

## VIII.    Malicious Prosecution

Larson brings a § 1983 claim for Malicious Prosecution in Violation of the Fourth Amendment (Count IX) against all 19 Defendants. However, § 1983 provides a remedy only for violations of rights secured by federal statutes or the Constitution. *Sanders v. Sears, Roebuck & Co.,* 984 F.2d 972, 977 (8th Cir. 1993). An action for malicious prosecution by itself is not punishable under § 1983 because it does not allege a constitutional injury. *Id.* Because the Court has recommended dismissal of Larson's federal claims, the Court recommends that his § 1983 claim for malicious prosecution be dismissed with prejudice.

## IX.    First Amendment Retaliation

Larson alleges a § 1983 First Amendment retaliation claim (Count VI) against Carlton County and prosecutors Berglund, Ranallo, and Boucher.[24] He contends they "continued the prosecution against [him] in retaliation for filing the civil rights action regarding the conditions of the Carlton County Jail." Compl. Sec. II ¶¶ 142-47 (emphasis supplied). The lawsuit in question, *Larson v. Lake,* was filed on July 24, 2017, two months *after* the incident, the criminal assault complaint, and his arrest in May 2017.

To establish a § 1983 claim for retaliation in violation of the First Amendment, a plaintiff must allege he engaged in a protected activity, the defendant responded with an adverse action that would "chill a person of ordinary firmness" from continuing that activity, and the plaintiff's protected activity motivated the defendant's adverse action such that the defendant would not have taken the action but for the retaliatory motive. *Beaulieu v. Ludeman,* 690 F.3d 1017, 1025 (8th Cir. 2012). Even if the prosecutors developed some retaliatory motive for continuing the

---

[24] He also asserts a § 1983 retaliation claim against the Minnesota Department of Human Services and MSOP in Count V, but as discussed above, the Court lacks subject matter jurisdiction over those Defendants.

prosecution that had begun two months earlier, they are protected by prosecutorial immunity, as the Court stated in rejecting this argument in his first lawsuit. *See* Order, 2019 WL 4565559, at *3. Therefore, the Court recommends that the retaliation claim against Berglund, Ranallo, and Boucher be dismissed with prejudice. The Court also recommends that the retaliation claim against Carlton County be dismissed with prejudice for the reasons discussed above in the section on municipal liability.

## X.    Conspiracy Under §§ 1983, 1985(2) and (3), and 1986

Larson alleges conspiracy under § 1983 (Count XII) against all 19 Defendants. He contends they conspired with each other to "instigate and continue the wrongful criminal prosecution" of him, meeting "at various times and with various participating," "ignor[ing] the exculpatory Incident reports," and "suborning perjured testimony, committing perjury, etc." Compl. Sec. II ¶¶192-94. As the Court stated in the first lawsuit, "a Section 1983 conspiracy claim must be predicated on an underlying deprivation of a constitutional right or privilege. *See Riddle v. Riepe,* 866 F.3d 943, 948-49 (8th Cir. 2017). When every underlying constitutional claim is dismissed, the Section 1983 conspiracy claim also must be dismissed. *Id.* at 949." Order, 2019 WL 4565559, at *3. Because the Court has recommended that Larson's underlying constitutional claims be dismissed, the Court also concludes that his second complaint fails to state a claim for conspiracy under § 1983 and recommends that this claim be dismissed with prejudice.

Larson also alleges conspiracy under §§ 1985(2) and (3) (Count XIII) and 1986 (Count XIV) against all 19 Defendants, contending they acted with the purpose of depriving him of equal protection of the laws. Compl. at 1-2. To satisfy the "equal protection" component of his § 1985(2) and (3) claims, "a pleading must allege that the motivating force behind the

28

conspiracy was discrimination on the basis of a suspect classification or characteristic." *Larson v. Jesson*, Case No. 11-cv-2247, 2018 WL 3352926, at *3 (D. Minn. July 9, 2018) (citing *Larson ex rel. Larson v. Miller*, 76 F.3d 1446, 1454 (8th Cir. 1996)).

Larson's second complaint, like the first, does not plead any particular protected class of which he is a member that forms the basis of his equal protection argument. However, in his opposition brief to the State Defendants' motion to dismiss he argues that he is "a member of a suspect class(es)/class of one that are/is routinely subjected to invidiously discriminatory animus – white, heterosexual, male, 'civilly committed' sex offenders." Pl. Br. 17, Docket No. 68.[25] However, as the Court pointed out in the first lawsuit, he makes no allegations that civilly committed sex offenders who are non-white, non-heterosexual, and/or non-male are treated differently based on their race, gender, or sexual orientation. His argument is that "sex offenders" comprise the suspect class: "Sex offenders, including those that are 'civilly' committed, are now clearly being (and have been historically) subjected to discrimination." *Id.*

As stated in the first lawsuit, his argument was considered and rejected by District Judge Paul Magnuson in July 2018 in a different lawsuit brought by Larson, the above-cited case of *Larson v. Jesson.* The Court agrees with Judge Magnuson's analysis in that case:

> Larson argues that sex offenders are a suspect class for purposes of § 1985 because they are subject to discrimination. But merely because individuals share a characteristic and may be subject to differential treatment on the basis of that characteristic does not mean that this differential treatment violates their equal protection rights. "The Equal Protection Clause does not mandate identical treatment of different categories of persons." *Plyler v. Doe*, 457 U.S. 202, 243 (1982). Only "irrational classification[s]" run afoul of the Equal Protection Clause. *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 532 (1973). Thus, the Supreme Court has limited the types of classifications that are subject to protection under the Clause to those that share "an immutable characteristic determined solely by

---

[25] He makes the same argument in his other two briefs. *See* Pl. Br. 17-19, Docket No. 69; Pl Br. 21-24, Docket No. 70.

the accident of birth," *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973), or that have been subject to a "history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 28 (1973). Classifications that are subject to protection under the Clause are limited to those such as race, alienage, national origin, religion, and gender; these classes share "some immutable characteristic beyond their control" and "require special protection by the courts because of vast discrimination . . . or their political powerlessness." *Gallagher v. City of Clayton*, 699 F.3d 1013, 1018 (8th Cir. 2012). No case has held that sex offenders constitute a suspect classification to which the Equal Protection Clause applies, and in fact courts have held the opposite. *See, e.g., United States v. Lafferty*, 608 F.Supp.2d 1131, 1144 (D.S.D. 2009) ("Sex offenders are not a suspect or quasi-suspect class."). And "[t]he Supreme Court has rejected the notion that a classification is suspect when 'entry into th[e] class . . . is the product of voluntary action.'" *United States v. Coleman,* 166 F.3d 428, 431 (2d Cir. 1999) (alteration in original) (quoting *Plyler*, 457 U.S. at 219 n.19). Larson's claims under § 1985(2) and (3) fail as a matter of law.

2018 WL 3352926, at 3.

Larson then shifts gears and asserts he is a "class of one," citing *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) (per curiam). Pl. Br. 20, Docket No. 68. But *Village of Willowbrook* is not a § 1985 conspiracy case and is not instructive here. In that case, a citizen challenged the village's demand for a 33-foot easement to connect her property to the municipal water supply, rather than the 15-foot easement required of other property owners seeking access to the water supply. 528 U.S. at 563. The Supreme Court held she stated a cognizable equal protection claim as a "class of one" because she alleged that the village intentionally treated her differently than others similarly situated and there was no rational basis for the difference in treatment. *Id.* at 564-65.

*Village of Willowbrook* is inapposite. Larson simply deploys the phrase "class of one" to evade the requirement to plead a protected class or suspect class, which he cannot satisfy. Larson does not allege he was treated differently from other similarly situated civilly committed persons in MSOP for arbitrary and irrational reasons. Rather, he devotes several pages to his

argument that civilly committed sex offenders are a suspect class. Pl. Br. 17-20, Docket No. 68.

Larson has again, for at least the third time in a lawsuit in this District, failed to plead a suspect class or characteristic that satisfies the equal protection component of his claim and therefore his § 1985(2) and (3) conspiracy claims fail as a matter of law. The Court recommends these claims be dismissed with prejudice. The Court likewise recommends dismissal with prejudice of his § 1986 claims, which depend on the existence of a valid § 1985 claim. *See Gatlin v. Green,* 362 F.3d 1089, 1095 (8th Cir. 2004) (§ 1986 claim must be predicated on a valid § 1985 claim).

## XI.   Defendants' Request for Dismissal with Prejudice and to Enjoin Further Similar Lawsuits

In his first lawsuit, Larson asserted that any dismissal of his federal claims should be without prejudice because he "is a pro se litigant and should be given the opportunity to 'adequately' present his claims, either by revision of his complaint or by retaining counsel." Objection at 10, Case No. 18-cv-2554 at Docket No. 79. The Court has read Larson's second complaint in its entirety, more than once, and he has not cured the first complaint's deficiencies, nor does it appear they can be cured. Instead, he has deleted certain details and peppered his second complaint with even more conclusory statements and theories. Larson appears to believe that making his complaint more ambiguous and conclusory, then asking the Court to liberally construe those ambiguities because he is *pro se*, must preclude dismissal of his claims at the pleading stage. *See, e.g.,* Pl. Br. 25 ("The Carlton County defendants recognize plaintiff alleges 'unclear' *Monell* claims, a liberal reading and interpretation of the complaint clearly shows allegations of *Monell* claims against Carlton County and the City of Moose Lake."), Docket No. 70.

Larson is incorrect. To survive a motion to dismiss, a complaint must plead specific facts to support a plausible claim, not just offer labels, conclusions, or a recitation of the elements of a cause of action. *Iqbal,* 556 U.S. at 678; *Kaylor,* 661 F.2d at 1183. Larson's second complaint is even less specific and more conclusory than the first one with respect to the actual incident at issue.[26] In addition, the allegations and issues have been extensively argued in 16 briefs spanning the two lawsuits.[27] Under the circumstances here, and for the reasons discussed in the sections above, the Court recommends that Larson's federal claims be dismissed with prejudice and further recommends that Larson be enjoined from filing any other actions in the District of Minnesota stemming from the 2017 incidents that are the basis of this lawsuit, unless he has first obtained written permission from a judicial officer in this District.

## XII.    State Law Claims

Because the Court recommends granting Defendants' motions to dismiss all of the federal claims pleaded in Larson's complaint, the Court likewise recommends that the Court decline to exercise supplemental jurisdiction over the state law claims and that they be dismissed without prejudice.

## XIII.    Larson's Motion for Temporary Restraining Orders and Permanent Injunctions

Larson moved for temporary and permanent injunctive relief to enjoin the Minnesota Department of Human Services and MSOP from enforcing the MSOP Client Mail policy and to

---

[26] The Court observes that, when another Court in this District ordered Larson to re-plead his claims with a "short and plain statement" to comply with Rule 8, noting his "habit of naming multiple individual Defendants in each claim," Larson responded with an 80-page amended complaint that "added more Defendants and complexity" rather than "reduc[ing] the number of Defendants or otherwise streamlin[ing] his pleadings." *Larson v. Jesson*, 2018 WL 3352926, at *1.

[27] Docket Nos. 39, 46, 53, 68-70, 74-75, 77 in this lawsuit and Nos. 23, 33, 41, 54, 58, 69-70 in Case No. 18-cv-2554.

require them to create the least restrictive environment possible at MSOP. Motion and Mem. 1, Docket No. 63. However, the relief he seeks is not based on the causes of action he pleaded in his complaint, which does not contain a single word about client mail or least restrictive environment. Therefore the Court recommends his motion be denied.

## XIV.    Larson's Motion for Stay

On February 18, 2020 Larson brought a motion to appoint counsel [Docket No. 16] which the Court denied on March 3, 2020 [Docket No. 23]. He did not object or appeal the order to the District Court Judge but instead filed an appeal to the Eighth Circuit on March 17, 2020 [Docket Nos. 60-62, 72]. He also moved to stay this case pending his appeal [Docket No. 58]. On March 26, 2020 Larson filed responses [Docket Nos. 68-70] to Defendants' motions to dismiss. On April 24, 2020 the Eighth Circuit dismissed his appeal for lack of jurisdiction [Docket No. 79]. Accordingly, Larson's motion for a stay is denied as moot.

**ORDER**

IT IS HEREBY ORDERED that Larson's Motion for Stay Pending Appeal of Denial of Appointment of Counsel [Docket No. 58] is DENIED as moot.

**RECOMMENDATION**

IT IS HEREBY RECOMMENDED that:

1.    The State Defendants' Motion to Dismiss [Docket No. 36] be GRANTED; the official capacity claims be dismissed without prejudice for lack of subject matter jurisdiction; the remaining federal claims be dismissed with prejudice; and the state law claims be dismissed without prejudice.

2.      That the Moose Lake Defendants' Motion to Dismiss [Docket No. 44] be GRANTED; the federal claims be dismissed with prejudice; and the state law claims be dismissed without prejudice.

3.      The Carlton County Defendants' Motion to Dismiss [Docket No. 50] be GRANTED; the federal claims be dismissed with prejudice; and the state law claims be dismissed without prejudice.

4.      That Larson's Motion for Temporary Restraining Orders and Permanent Injunctions [Docket No. 63] be DENIED.

5.      That Larson be enjoined from filing any other actions in the District of Minnesota based on the same or similar allegations as those in this lawsuit relating to the 2017 incident, arrest, and prosecution, unless he has first obtained written permission from a judicial officer in this District.

Dated: September 9, 2020                        _s/David T. Schultz_____
                                                DAVID T. SCHULTZ
                                                U.S. Magistrate Judge


**NOTICE**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).